UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| MICHAEL GAONA and ALESHEA CHANEL THAMES, | § § § | |
| Plaintiffs, | § § | |
| v. | § § | SA-23-CV-280-FB (HJB) |
| WELLS FARGO BANK, N.A. and TIMOTHY WELLS, | § § § § | |
| Defendants. | § § | |

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

**To the Honorable United States District Judge Fred Biery:**

This Report and Recommendation concerns Defendants' Motion for Summary Judgment and Brief in Support (Docket Entry 25). Pretrial matters have been referred to the undersigned for consideration. (Docket Entry 5.) For the reasons set out below, I recommend that the motion be **GRANTED IN PART** and **DENIED IN PART**.

**I.      Jurisdiction.**

Plaintiffs assert one federal claim and two related state-law claims arising out of the termination of their employment with Defendant Wells Fargo Bank, N.A. ("Wells Fargo"). (Docket Entry 1-1, at 5–7.) The Court has original jurisdiction over the federal claim pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over the related state-law claims pursuant to 28 U.S.C. § 1367. The undersigned has the authority to issue this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

II.    **Background.**

A.    ***Plaintiffs' Employment at Wells Fargo.***

Plaintiff Michael Gaona began working for Wells Fargo on January 29, 2007, as a lead teller at a branch in Lakehills, Texas.  (Docket Entry 25-1, at 3.)  Sometime shortly thereafter, Gaona transferred to the Marbach branch in San Antonio, Texas, still working as a lead teller.  (*Id.* at 4.)  In the Spring of 2008, Gaona was promoted to the role of personal banker at the Marbach branch, where he remained for several years.  (*Id.* at 5–6.)  Sometime in the Spring of 2012, Gaona was promoted to the role of branch manager for the Martin Luther King Plaza branch.  (*Id.* at 8.)  Gaona spent one year managing that branch before being promoted again, in 2013, to the role of branch manager for the larger Foster Road branch.  (*Id.*)  Gaona remained in that role—and received two pay raises and a stellar performance review—until his termination on June 17, 2022.  (*Id.* at 8, 15; Docket Entry 25-6, at 10; Docket Entry 34-5, at 2.)

Plaintiff Aleshea Thames, is another former employee of Wells Fargo.  She was hired on February 6, 2015, as a personal banker at the branch in La Vernia, Texas.  (Docket Entry 25-2, at 3.)  Approximately one year later, in March of 2016, Thames transferred to the Foster Road branch in San Antonio, Texas, where Gaona was serving as branch manager.  (*Id.* at 4.)  Thames remained at the Foster Road branch until her termination on June 17, 2022.  (Docket Entry 34-8, at 3.)

B.    ***Gaona's Military Service.***

On October 18, 2019, about six years after assuming his position as branch manager for the Foster Road branch, Gaona enlisted in the Texas Army National Guard ("TANG").  (Docket Entry 25-1, at 9.)  On January 2, 2020, Gaona left his position at the Foster Road branch for 10 weeks to attend basic training.  (*Id.* at 10–11.)  Upon his return from basic training, on March 13, 2020, Gaona was reinstated in his branch manager position at Foster Road.  (*Id.* at 11–12.)  Gaona left

the Foster Road branch again on June 1, 2020, after the Governor activated his TANG unit following the murder of George Floyd by police in Minnesota. (*Id.* at 12; Docket Entry 25-3, at 2.) Two weeks later, Gaona returned to his position as branch manager at Foster Road. (Docket Entry 25-1, at 14; Docket Entry 25-3, at 2.) On June 29, 2020, an article was published on Wells Fargo's employee-intranet page, praising Gaona as a "San Antonio Hero" for his service. (Docket Entry 25-3, at 2.) Gaona left at least once more in December of 2021 to attend TANG annual training, and again was reinstated as branch manager at Foster Road upon his return. (Docket Entry 25-1, at 24.)

On May 2, 2022, Gaona received official orders from TANG to appear at ROTC summer training at Fort Knox, Kentucky. (Docket Entry 25-4, at 11.) The training was to last 35 days, beginning on July 5, 2022, and ending on August 8, 2022. (*Id.*) Gaona already had a general understanding that he would be required to attend such training in the Summer of 2022, and verbally notified Defendant Timothy Wells—Wells Fargo's district manager and Gaona's direct supervisor. (Docket Entry 34-6, at 15.) Once he received his official orders, Gaona immediately emailed a copy of said orders to Wells. (Docket Entry 25-4, at 2.) However, as described in greater detail below, Gaona would no longer be employed by Wells Fargo by the time he arrived at his scheduled ROTC training. (See id. at 11; Docket Entry 25-6, at 10; Docket Entry 34-1, at 6–7.)

C. ***Wells Fargo's Investigation into Falsification of Bank Records and Subsequent Termination of Plaintiffs.***

In early 2022, Wells Fargo conducted an investigation into the falsification of bank records at bank branches in the San Antonio area. The issue apparently first arose when, in December 2021, Cindy Delgado, manager at the North Star branch, confronted Sasha Shimohata, one of the personal bankers, about some missing documentation. (Docket Entry 25-7, at 8.) Delgado had assigned Shimohata to complete the "control online task" ("COT") of reviewing and documenting

3

any technical exceptions ("TEs") for November of 2021.  (*Id.*)  Shimohata had marked the COT complete on November 18, 2021, and Delgado certified that Shimohata completed the COT as directed on December 8, 2021.  (*See id.*; Docket Entry 34-15, at 2.) However, when the personal banker assigned to complete the task for December asked Shimohata for the documents from the previous month, Shimohata reported that she did not have them.  (Docket Entry 25-7, at 8)  When Delgado asked her where the documents were, Shimohata reported that there were none because there were no TEs in November of 2021.  (*Id.*)  Delgado told Shimohata that there were, in fact, five TEs.  (*Id.*)  Admonishing Shimohata that marking COTs complete without reviewing or documenting TEs was a "falsification of bank records," Delgado reported the matter to Wells Fargo's HR department.  (*Id.*)

On December 24, 2021, Sarah Nelson, Wells Fargo's risk management specialist, advised district manager Wells of the Shimohata incident.  (Docket Entry 25-5, at 3–6.)  Wells reached out to Delgado, instructing her to consult with Wells Fargo's employee relations ("ER") department as to how to proceed.  (Docket Entry 25-5, at 6.)  An investigation into the matter was initiated on January 6, 2022.  (Docket Entry 34-9, at 4.)  Wells Fargo's investigators concluded that, on November 18, 2021, Shimohata marked a COT as complete without reviewing and documenting the TEs.  (Docket Entry 34-9, at 4.)  Shimohata reported that the error was not intentional: she may have reviewed the wrong report because she did not see any TEs.  (*Id.* at 2, 4.)  Wells Fargo's ER department recommended that Shimohata be terminated, and that Delgado be "coach[ed] . . . for having withheld reporting of additional similar incidents by other employees."  (*Id.* at 2–4.)

Wells fired Shimohata on February 28, 2022.  (Docket Entry 25-5, at 9; Docket Entry 34-9, at 3.)  Delgado, however, was not fired for improperly certifying that Shimohata completed the COT correctly.  (Docket Entry 34-6, at 9–10; Docket Entry 34-15, at 2; *see* Docket Entry 25, at 7;

Docket Entry 36, at 3–4.)  In January of 2022, Wells Fargo stopped using personal bankers and branch managers to complete and certify COTs.  (Docket Entry 34-7, at 2.)  From that point on, Wells Fargo entrusted those tasks to a branch supervision program.  (*Id.*)

In light of the North Star incident, district manager Wells initiated an investigation into the rest of the branches under his supervision, to determine whether COTs were being falsely marked or certified as completed anywhere else.  (Docket Entry 25-5, at 6; Docket Entry 25-6, at 11–12.)  The investigation uncovered that the same misrepresentations had occurred at the Foster Road branch and the branch in Seguin, Texas.  (Docket Entry 25-5, at 7.)  At the Foster Road branch, the conclusions of the investigation were that Thames had falsely reported completing three consecutive COTs—for October of 2021, November of 2021, and December of 2021—and that Gaona, in turn, had falsely certified their completion.  (Docket Entry 25-6, at 2; Docket Entry 25-9, at 2–4; Docket Entry 34-1, at 7; Docket Entry 34-10, at 2–3; Docket Entry 34-13, at 2.)  Upon completion of the investigation, Wells Fargo's Regional President, Joe Atkinson, instructed Wells to fire Thames and Gaona.  (Docket Entry 25-5, at 8–9.)  Wells terminated their employment on June 17, 2022.  (Docket Entry 25-1, at 25–26; Docket Entry 25-2, at 5; Docket Entry 25-6, at 10, 13; Docket Entry 34-1, at 6–7.)

When Gaona learned of his termination, he denied any wrongdoing, reminded Wells how much he had given to Wells Fargo, and then left the building.  (Docket Entry 25-1, at 27.)  Thames cried upon learning of her termination.  (Docket Entry 25-2, at 6.)  Neither Gaona nor Thames asked for any clarification as to the stated reasons for their termination.  (Docket Entry 25-1, at 26; 25-2, at 6.)  Thames was permitted to gather her things and say goodbye to her coworkers before she left.  (Docket Entry 25-2, at 6.)

**D.  *Procedural History.***

Plaintiffs filed suit in state court on January 24, 2023.  (Docket Entry 1-1.)  In their petition, Plaintiffs assert three claims in total—two pertaining to Gaona and one as to Thames.  (*Id.* at 5–7.)  As to Gaona, Plaintiffs claim that his termination constituted discrimination on the basis of his TANG-based leaves of absences, in violation of the Uniformed Services Employment and Reemployment Rights Act ("USERRA"), 38 U.S.C. § 4311(a), and its state-law equivalent in the Texas Government Code ("TXSERRA") Tex. Gov. Code Ann. § 437.2131.  (*Id.* at 5–6.)  As to Thames, Plaintiffs claim intentional infliction of emotional distress ("IIED"), alleging that her termination was "part of a scheme to fabricate a pretext for terminating Gaona's employment on the basis of [his] service in the TANG."  (*Id.* at 7.)

Defendants removed the case to this Court on March 7, 2023 (Docket Entry 1), and they have now moved for summary judgment (Docket Entry 25).

## III.  Summary Judgment Standard.

The purpose of summary judgment is "to isolate and dispose of factually unsupported claims or defenses."  *Hayes v. Locke Supply Co.*, 724 F. Supp. 3d 609, 612 (E.D. Tex. 2024) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).  Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Allen v. United States Postal Serv.*, 63 F.4th 292, 300 (5th Cir. 2023) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A disputed fact is material when it "might affect the outcome of the suit under the governing law."  *Id.* (quoting *Anderson*, 447 U.S. at 248).

The party moving for summary judgment "bears the initial burden of . . . demonstrat[ing] the absence of a genuine issue of material fact." *Espinoza v. State Farm Mut. Auto. Ins. Co.*, No. 7:19-CV-00299, 2020 WL 5040409, at *1 (S.D. Tex. Aug. 26, 2020) (quoting *Lynch Props. v. Potomac Ins. Co. of Ill.*, 140 F.3d 622, 625 (5th Cir. 1998)). To demonstrate such absence, "the movant must point to competent evidence in the record, such as documents, affidavits, and deposition testimony and must 'articulate precisely how this evidence supports [it].'" *Espinoza*, 2020 WL 5040409, at *1 (quoting *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010)). If the movant fails to do so, summary judgment "must be denied, regardless of the nonmovant's response." *Espinoza*, 2020 WL 5040409, at *1 (quoting *Pioneer Expl., L.L.C. v. Steadfast Ins. Co.*, 767 F.3d 503, 511 (5th Cir. 2014)). If the movant meets its burden, "the nonmovant must then direct the court's attention to evidence in the record sufficient to establish that there is a genuine issue of material fact for trial." *Mary Kay, Inc. v. Weber*, 601 F. Supp. 2d 839, 851 (N.D. Tex. 2009) (citing *Celotex*, 477 U.S. at, 323–24).

When the movant "also carries the burden of proof at trial"—*e.g.*, a defendant moving for summary judgment on an affirmative defense—"[its] burden is even higher." *Guzman v. Allstate Assur. Co.*, 18 F.4th 157, 160 (5th Cir. 2021). In that scenario, the movant must "establish beyond peradventure all of the essential elements of the claim [or defense]." *Id.*; *see Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986)). "[B]eyond peradventure" is a "heavy" standard. *Carolina Cas. Ins. Co. v. Sowell*, 603 F. Supp. 2d 914, 924 (N.D. Tex. 2009) (citation omitted). But if the movant succeeds, the burden then shifts to the nonmovant to "direct the court's attention to evidence in the record sufficient to establish that there is a genuine issue of material fact for trial." *Mary Kay, Inc.*, 601 F. Supp. 2d at 851 (citing *Celotex*, 477 U.S. at 323–24).

When considering a motion for summary judgment, the Court "may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). Instead, the Court "must view all facts and evidence in the light most favorable to the non-moving party." *Feist v. La., Dep't of Just., Off. of the Atty. Gen.*, 730 F.3d 450, 452 (5th Cir. 2013). This also means that the Court must "construe all reasonable inferences in [the non-movant's] favor." *Guzman*, 18 F.4th at 160. However, the Court may only do so "when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts.'" *Meaux v. Cooper Consol., LLC*, 477 F. Supp. 3d 515, 523 (E.D. La. 2020) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)). In making its determinations, the Court need only consider the party's cited materials. Fᴇᴅ. R. Cɪᴠ. P. 56(c)(3); *see Am. Fam. Life Assur. Co. of Columbus v. Biles*, 714 F.3d 887, 896 (5th Cir. 2013) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence . . . .") (citation omitted).

## IV. Analysis.

Defendant's have moved for summary judgment on Gaona's USERRA claim and Thames's IIED claim. For the reasons set out below, I recommend that summary judgment be denied as to the USERRA claim, but granted as to the IIED claim.[1]

### A. *Gaona's USERRA Claim.*

Gaona claims that he was terminated in violation of USERRA's antidiscrimination provision, 38 U.S.C. § 4311(a). Section 4311(a) provides that a servicemember "shall not be

---

[1] While Defendants attack the adequacy of evidence produced to support the USERRA and IIED claims, they make no mention of the TXSERRA claim. Nor is this claim addressed in Plaintiffs' response (Docket Entry 34) or Defendants' reply (Docket Entry 36).

TXSERRA provides that:

denied . . . retention in employment . . . or any benefit of employment" because of his or her military service. 38 U.S.C. § 4311(a). An employer violates this prohibition when "membership, . . . service, . . . or obligation for service in the uniformed services is a motivating factor" in an employment decision. 38 U.S.C. § 4311(c)(1). Military status is a "motivating factor" if it is "one of the reasons" for the employer's action. *Garcia-Ascanio v. Spring Indep. Sch. Dist.*, 74 F.4th 305, 310 (5th Cir. 2023) (citing *Bradberry v. Jefferson Cnty., Tex.*, 732 F.3d 540, 545 (5th Cir. 2013) (citing 20 C.F.R. § 1002.22 (2006))).

Like other federal employment discrimination laws, USERRA employs a "burden-shifting framework." *Garcia-Ascanio*, 74 F.4th at 310. Similar to Title VII cases, the plaintiff in a USERRA case "has the [initial] burden of proving that a status or activity protected by USERRA was one of the reasons for the employer's decision." *Bradberry*, 732 F.3d at 545 (citing 20 C.F.R. § 1002.22). Put otherwise, "a plaintiff must first establish a prima facie case of discrimination, demonstrating that his participation as a service member was a motivating factor behind the employer's adverse employment action." *Hansen v. Alamo Mobile X-Ray & Ekg Servs., Inc.*, No.

---

[A] service member of the Texas military forces who is ordered to state active duty or to state training and . . . is entitled . . . to the same benefits and protections provided to persons . . . performing services in the uniformed services as provided by [USERRA] . . . may retain private legal counsel and . . . file a civil action in a district court in this state if the service member is aggrieved by a violation of or is denied a benefit or protection guaranteed under . . . [USERRA].

TEX. GOV. CODE § 437.2131(a)–(b). Although the undersigned had found no cases interpreting TXSERRA the language of § 473.2131 would suggest that Defendants cannot prevail on Gaona's TXSERRA claim unless they also prevail on his USERRA claim. As discussed *infra*, summary judgment should be denied as to Gaona's USERRA claim. Accordingly, even assuming that Defendants' motion has requested summary judgment on the TXSERRA claim, the Court should deny the request.

SA-14-CA-01070-FB, 2016 WL 7486370, at *2 (W.D. Tex. Feb. 10, 2016).  Discriminatory motive

may be reasonably inferred from several factors, including:

> [1] proximity in time between the employee's military activity and the adverse
> employment action, [2] inconsistencies between the proffered reason and other
> actions of the employer, [3] an employer's expressed hostility towards members
> protected by the statute together with knowledge of the employee's military
> activity, and [4] disparate treatment of certain employees compared to other
> employees with similar work records or offenses.

*Garza v. Energy Transfer Partners, L.L.C.*, No. 3:23-CV-0027-D, 2024 WL 991588, at *6-7 (N.D.

Tex. Mar. 7, 2024) (citation omitted), *aff'd*, No. 24-10208, 2025 WL 304527 (5th Cir. Jan. 27,

2025).

  If a plaintiff establishes a prima facie case of discrimination, the burden shifts, but the rules

are different than those under Title VII.  Instead of imposing a simple burden of production  as to

a legitimate non-discriminatory reason for its action, USERRA requires the employer "to prove

the affirmative defense that it would have taken the action anyway."  *Garcia-Ascanio*, 74 F.4th at

310 (citing *Bradberry*, 732 F.3d at 547).  An employer cannot satisfy its burden by showing that it

was motivated *in part* by a legitimate reason—"[r]ather, the employer must show that its legitimate

reason, standing alone, would have induced it to make the same decision."  *Robinson v. Morris*

*Moore Chevrolet-Buick, Inc.*, 974 F. Supp. 571, 576 (E.D. Tex. 1997); *accord. Mayeaux v. Hous.*

*Indep. Sch. Dist.*, 986 F. Supp. 2d 842, 850–51 (S.D. Tex. 2014).  Additionally, in contrast with

Title VII cases, the burden under USERRA does not shift back to the plaintiff to demonstrate that

the employer's legitimate reason is pretext—"the burden [remains] on the employer to show lack

of pretext."  *Mayeaux*, 986 F. Supp. 2d at 848 (quoting *Velazquez-Garcia v. Horizon Lines of P.R.,*

*Inc.*, 473 F.3d 11, 17 (1st Cir. 2007)).

1.    *Plaintiffs' Prima Facie Case.*

Defendants argue that Plaintiffs cannot carry their initial burden of establishing a *prima facie* case of discrimination.  They argue (a) that Plaintiffs have produced no evidence that Defendants ever considered Gaona's TANG service when terminating his employment; (b) that there is no comparator evidence showing disparate treatment of other employees; and (c) that temporal proximity cannot support a prima facie case here.  (Docket Entry 25, at 16.)  Each argument is addressed below.

a.    Consideration of Gaona's National Guard service.

Defendants point out that they continued to employ Gaona after his enlistment in TANG on October 18, 2019, and allowed him to take several military leaves of absence, always to be reinstated in his job upon his return.  (Docket Entry 25, at 16, 19; *see* Docket Entry 25-1, at 10–12, 14, 24; Docket Entry 25-3, at 2).  Defendants also point to provisions of Wells Fargo's employee handbook advising employees of their rights under USERRA, including the right to have their jobs reinstated upon return from military leave.  (Docket Entry 25, at 16; Docket Entry 25-13, at 4.)  Defendants argue that such a policy is evidence that they "respect[ed] and honor[ed] military service," and therefore lacked any discriminatory animus against veterans and servicemen. (*Id.* (quoting *Gill v. Petroleum Co-Ordinators, Inc.*, No. 6:14-CV-02869, 2016 WL 4574169, at *5 (W.D. La. Aug. 31, 2016).)  And, as further evidence that they were supportive of Gaona's military service, Defendants point to the article posted by Delgado on Wells Fargo's intranet system on June 29, 2020, praising Gaona as a hero.  (Docket Entry 25, at 20; Docket Entry 25-3, at 2.)

To counter Defendants' evidence that they were perfectly accommodating to Gaona or any other servicemembers employed by Wells Fargo, Plaintiffs rely upon portions of Gaona's and Wells' deposition testimonies.  (Docket Entry 34, at 8–9, 11.)  Plaintiffs point to Gaona's testimony

11

that when he told Wells about his scheduled ROTC training for the Summer of 2022, Wells responded that he was not sure Wells Fargo could allow that and that he would have to check with the HR department to confirm one way or the other. (*Id.* at 8; Docket Entry 24-1, at 28.) Gaona assured Wells that the absence was permitted, providing him with information regarding USERRA. (Docket Entry 24-1, at 28.) Gaona also testified that one of Wells Fargo's employees who was to be serve as the acting branch manager during Gaona's leaves of absences was a military veteran, and that he quit his job because the work environment was hostile to servicemembers. (Docket Entry 25, at 9; Docket Entry 25-1, at 11.)

With regard to Wells, Plaintiffs point to his testimony that he had never "managed a service member before" Gaona, and that he researched USERRA once Gaona notified him of his ROTC training in the Summer of 2022, "because it was an extended [amount of] time" for Gaona to be on leave. (Docket Entry 34, at 11 (citing Docket Entry 34-6, at 16–17).) Based on the aforementioned testimony, Plaintiffs argue that it is reasonable to infer "that the adverse employment action against Gaona was related to the extended [ROTC] leave, which was to commence on July 5, 2022." (Docket Entry 34, at 11.)

It is somewhat doubtful that the testimony cited by Plaintiffs, standing alone, is sufficient to withstand summary judgment in this case. However, it is evidence that the Court may wish to consider with the other evidence below in determining whether a genuine dispute of material has been raised regarding Plaintiff's prima facie case.

### b. Disparate treatment.

Defendants argue that Plaintiffs have failed to establish a prima facie case of discrimination because they have produced no evidence of disparate treatment of comparable employees. (Docket Entry 25, at 17.) They point out that two other employees—Thames and Shimohata—were

terminated for committing the same alleged violations as Gaona—*i.e.*, "falsification of [bank] records." (*Id.*) Plaintiffs respond that the proper comparator employee is neither Thames nor Shimohata; instead, the proper comparator is Cindy Delgado, a branch manager like Gaona. (Docket Entry 34, at 7, 11–12.) The point is well taken. Whereas Thames and Shimohata were both personal bankers who allegedly falsely marked that COTs were completed, Gaona and Delgado were both branch managers alleged to have *certified* that their bankers had properly completed the COTs. As such, Delgado appears to be the proper comparator for determining whether disparate treatment occurred.

With Delgado as the comparator, Gaona argues that he can show disparate treatment in this case. Even though Delgado certified that Shimohata completed the COT for November of 2021 when she had not (Docket Entry 34-6, at 9–10; 34-15, at 2), Defendants did not terminate Delgado's employment. (Docket Entry 34, at 11–12; *see* Docket Entry 25, at 17; Docket Entry 36, at 3–4.) Instead, Delgado ostensibly received "coaching." (Docket Entry 34, at 11–12; Docket Entry 34-9, at 2–4.) Gaona, on the other hand, was fired for certifying that Thames had properly completed her COTs when she allegedly had not. (Docket Entry 25-1, at 25–26; Docket Entry 25-5, at 8–9; Docket Entry 25-6, at 2, 10; Docket Entry 25-11, at 4–5; Docket Entry 34-1, at 6–7.)

Defendants argue that the comparison is improper because "Gaona's and Delgado's behavior with respect to the control online task certification could not have been more different." (Docket Entry 36, at 4.) Specifically, Defendants argue that Delgado "confronted Ms. Shimohata" regarding her one failure to properly complete the COT for November of 2021 and "promptly reported it," whereas Gaona "certified tasks in three (3) consecutive months, . . . failed to identify the mistake on his own, and did not report [the] mistake." (Docket Entry 25, at 17.) As Defendants tell it, Shimohata made a mistake and Delgado did everything correctly upon discovering it. But

their account fails to acknowledge that Delgado improperly certified the mistake just as Gaona had; moreover, there is some evidence in the record that she had failed to report similar mistakes made by several other employees in the past. (*See* Docket Entry 34-9, at 2–4; Docket Entry 34-15, at 2.) This evidence is sufficient to raise a genuine dispute as to whether Gaona received treatment disparate from that received by a similarly-situated employee.

### c. Temporal proximity.

Defendants lastly argue that discriminatory motive should not be inferred from the close temporal proximity between Gaona's termination and his scheduled leave for ROTC training. (Docket Entry 25, at 18–19.) That leave was scheduled from July 5, 2022, to August 8, 2022; Gaona was terminated on June 17, 2022. (Docket Entry 25-4, at 2, 11; Docket Entry 25-6, at 10.) Thus, Gaona was fired a mere 18 days before he was to depart for his month-long ROTC training.

Defendants direct the Court's attention to out-of-circuit cases which stand for the proposition that temporal proximity cannot suffice by itself to establish a plaintiff's prima facie case under USERRA that their military leave was a motivating factor in their termination. (Docket Entry 25, at 18–19.)[2] Plaintiffs, however, have done more than just point to the temporal proximity between Gaona's ROTC leave and his termination. As noted above, they have additionally produced evidence which, if construed in Plaintiffs favor, shows that Wells was taken aback by how long Gaona's ROTC leave was scheduled to last; that a former employee left on account of hostility toward military veterans; and that another branch manager received coaching rather than

---

[2] *See, e.g.*, *Vega-Colon v. Wyeth Pharm.*, 625 F.3d 22, 29 (1st Cir. 2010) ("[T]hough the proximity in time between . . . [plaintiff's military] leave and . . . [the adverse employment action] is a factor for consideration, it alone is not sufficient."); *Herrera v. City of Hialeah, Fla.*, No. 21-14271, 2023 WL 238999, at *5 (11th Cir. Jan. 18, 2023) ("[S]how[ing] a temporal proximity between the [adverse employment action] . . . and [the plaintiff's] military service . . . would not automatically meet [the plaintiff's] prima facie burden").

termination for similar conduct.  This evidence, when combined with the fact that  Gaona was fired 18 days before he was to go on military leave, establishes a prima facie case of discrimination under USERRA sufficient to withstand a summary judgment motion.

### 2. *Defendants' Affirmative Defense.*

Defendants argue that, even if a reasonable jury could infer from the evidence recounted above that Gaona's military service may have been one of the reasons for his termination, he would have been fired regardless of his military status.  (Docket Entry 25, at 20–21.)  Specifically, they argue that, after a thorough investigation, a bank investigator found that Gaona violated Wells Fargo's policies by committing acts tantamount to falsifying bank records.  (Docket Entry 25, at 21.)  Defendants then point out that falsification of bank records is a terminable offense under the terms of Wells Fargo's Employee Handbook.  (Docket Entry 25, at 21; Docket Entry 25-8, at 3.) Thus, according to Defendants, Gaona's termination was inevitable.

Defendants' argument fails to justify a grant of summary judgment in their favor, for two reasons.  First, Wells Fargo's Employee Handbook does not actually *require* termination for falsifying bank records.   To the contrary, it specifically states that "[f]alsifying required documentation can result in corrective action, which *may* include termination of . . . employment." (Docket Entry 25-13, at 3.)  Even when discussing grounds for immediate termination, the policy hedges: [f]alsification of records. . . . *may* result in immediate termination of employment." (Docket Entry 25-8, at 2–3.)  "[T]he word 'may' clearly connotes discretion."  *Biden v. Tex.*, 597 U.S. 785, 802 (2022) (emphasis omitted).  And the discretionary nature of the policy is confirmed by the facts of this case: Gaona was fired for allegedly falsifying a certification, but Delgado was not.  (*Compare* Docket Entry 25-9 *with* Docket Entry 34-15.)

Second, Plaintiffs have produced some evidence which calls into question the credibility of the investigator upon whose report Gaona's termination was based. Specifically, Plaintiffs identify several statements in the investigator's report where, they claim, he misstated or otherwise falsely characterized their responses to interview questions. (Docket Entry 34, at 8; Docket Entry 34-1, at 4, 8–10; Docket Entry 34-17, at 4–5.) And they point out that Atkinson—Wells Fargo's regional president who ultimately directed Wells to fire Gaona—testified that if "factual findings in the investigative reports turned out to be incorrect," then it would have "ha[d] an impact" on his decision to do so. (Docket Entry 34-14, at 6.) The Court should not resolve the credibility of the investigator: on summary judgment, it "may not make credibility determinations or weigh the evidence," *Reeves*, 530 U.S. at 150. Suffice it to say that, Given Atkinson's testimony, the discrepancies in the investigator's notes raise additional questions as to the Defendants' asserted basis for terminating Gaona's employment which preclude the Court from finding, beyond peradventure, that Defendants would have terminated Gaona's employment regardless of his TANG service because he certified incomplete COTs. As such, Defendants are not entitled to summary judgment on Gaona's USERRA claim.

**B.  *Thames's IIED Claim.***

Thames asserts an IIED claim, alleging that Defendants "terminated [her] employment as part of a scheme to fabricate a pretext for terminating Gaona's employment on the basis of [his] service in the TANG." (Docket Entry 1-1, at 7.) Plaintiffs allege that Thames' termination was extreme and outrageous, that Defendants intended to cause her severe emotional distress, and that she suffered severe emotional distress as a result. (*Id.* at 7–8.) Plaintiffs' claim fails.

1.  *Applicable Law.*

"Under Texas law, a plaintiff bringing an IIED claim must demonstrate that the defendant [1] intentionally or recklessly [2] engaged in extreme or outrageous conduct [3] that resulted in severe emotional distress." *Stelly v. Duriso*, 982 F.3d 403, 407–08 (5th Cir. 2020) (citing *Standard Fruit & Vegetable Co. v. Johnson*, 985 S.W.2d 62, 66 (Tex. 1998)). "The severity of distress is an element of the cause of action, not merely of the damages." *Munoz v. H&M Wholesale, Inc.*, 926 F. Supp. 596, 612 (S.D. Tex. 1996) (collecting cases).

To establish that the defendant acted intentionally or recklessly, a plaintiff must prove that emotional distress was the "intended or primary consequence of the defendant's conduct." *GTE Sw., Inc. v. Bruce*, 998 S.W.2d 605, 611 (Tex. 1999) (citing *Standard Fruit*, 985 S.W.2d at 68); *accord. Espinosa v. Aaron's Rents, Inc.*, 484 S.W.3d 533, 546 (Tex. App.—Houston [1st Dist.] 2016, no pet.). An IIED claim is not available when the "emotional distress is solely derivative of or incidental to the intended or most likely consequence of the actor's conduct." *McManaway v. KBR, Inc.*, No. 4:10-CV-1044, 2015 WL 13679501, at *6 (S.D. Tex. Oct. 23, 2015) (quoting *Standard Fruit*, 985 S.W.2d at 67).

To establish that the defendant's conduct was "extreme and outrageous," a plaintiff must prove that it was "beyond all possible bounds of decency," "atrocious," and "utterly intolerable in a civilized society." *Jones v. Dall. Cnty.*, 47 F. Supp. 3d 469, 479 (N.D. Tex. 2014) (quoting *Tex. Farm Bureau Mut. Ins. Cos. v. Sears*, 84 S.W.3d 604, 610 (Tex. 2002)). "[T]hat an action is intentional, malicious, or even criminal does not, standing alone, mean that it is extreme or outrageous for purposes of [IIED]." *Brewerton v. Dalrymple*, 997 S.W.2d 212, 215 (Tex. 1999) (citing RESTATEMENT (SECOND) OF TORTS § 46(1) (1965)) "Courts must determine as a threshold matter whether the defendant's conduct may reasonably be regarded as so extreme and outrageous

17

as to permit recovery." *City of Midland v. O'Bryant*, 18 S.W.3d 209, 216–17 (Tex. 2000) (citation and internal quotation marks omitted). "Only when reasonable minds may differ is it for the jury" to decide. *Jones*, 47 F. Supp. 3d at 479 (citing *GTE Sw.*, 998 S.W.2d at 616). "[T]he kind of extreme conduct necessary to raise a fact question of [IIED] in the workplace 'exists only in the most unusual of circumstances.'" *O'Bryant*, 18 S.W.3d at 217 (quoting *GTE Sw.*, 998 S.W.2d at 612–13). Thus, "[t]he fact of [a] discharge itself as a matter of law cannot constitute outrageous behavior." *Munoz*, 926 F. Supp. at 612 (quoting *Wornick Co v. Casas*, 856 S.W.2d 732, 735 (Tex. 1993)).

To establish that the emotional distress is sufficiently severe to support liability for IIED, a plaintiff "must prove 'distress that is so severe that no reasonable person could be expected to endure it." *Jones*, 47 F. Supp. 3d at 479 (quoting *GTE Sw.*, 998 S.W.2d at 618). In short, IIED claims require proof of "an extraordinarily damaging impact on a plaintiff." *Amin v. United Parcel Serv., Inc.*, 66 F.4th 568, 574 (5th Cir. 2023) (holding that emotional distress was insufficiently severe where the plaintiff did not seek treatment, was "withdrawn and no longer happy," and suffered from "anger, depression, and humiliation"). Courts in Texas have held emotional distress to be sufficiently severe where it resulted in "severe psychosomatic symptoms, suicidal ideation, a marked degradation in physical appearance, or post-traumatic stress disorder," *id.* (citing cases), or "psychiatric problems, . . . . debilitating headaches, . . . . [and] suicidal, reactive depression," *Munoz*, 926 F. Supp. at 613 (citing cases).

### 2. *Discussion.*

Defendants argue that Thames' IIED claim must fail because courts have routinely found in favor of employers whose conduct was substantially worse than what Thames alleges took place here. (Docket Entry 25, at 24–27 (citing cases).) As such, Defendants argue, Thames can produce

no evidence that their conduct rose to the level of "extreme and outrageous." (*Id.*)  In response, Plaintiffs point to the discrepancies between what Wells Fargo's investigator reported and Thames' testimony as to what she told him.  (Docket Entry 34, at 24 ("Thames told the . . . investigator that she had completed the task, . . . yet the investigator put in his notes that she said she was 'not sure.'").)  Aside from that, the only evidence Plaintiffs produced to substantiate Thames' assertion that her termination was extreme and outrageous is the fact of her termination itself.  But "the fact of discharge itself as a matter of law cannot constitute outrageous behavior." *Munoz*, 926 F. Supp. at 612; *Wornick*; 856 S.W.2d at 735.

Even if it were true, as Plaintiffs insist, that Defendants terminated Thames' employment as part of a scheme to terminate Gaona's employment, her termination is not thereby elevated to the level of extreme and outrageous for purposes of IIED.  *See Brewerton*, 997 S.W.2d 215 ("[T]hat an action is intentional, malicious, or even criminal does not, standing alone, mean that it is extreme or outrageous for purposes of [IIED].").  Plaintiffs have failed to produce evidence to raise a genuine dispute that Defendants acted "beyond all possible bounds of decency," by firing Thames—an at-will employee.  *Sears*, 84 S.W.3d at 610; *see Wornick*; 856 S.W.2d at 735 ("In exercising its rights as an employer-at-will, . . . [defendant's] conduct as a matter of law did not exceed all possible bounds of decency and was not utterly intolerable in a civilized community.") (citations and internal quotation marks omitted).

Plaintiffs have also failed to produce any evidence that Defendants intended Thames' emotional distress or that said distress was sufficiently severe to support an IIED claim.  As to intent, Plaintiffs do no more than assert in their response that Thames "believes [Defendants] intended her distress by including her in the scheme to terminate Gaona."  (Docket Entry 34, at 24.)  To support this claimed belief, Plaintiffs cited to portions of Thames' deposition; however,

19

they failed to attach these portions as evidence to their response.  Even if they had, "[a] plaintiff's subjective inference, without proof from which an inference might be drawn, is not enough to survive summary judgment." *Corbin v. Sw. Airlines, Inc.*, No. CV H-17-2813, 2018 WL 4901155, at *13 (S.D. Tex. Oct. 9, 2018) (Rosenthal, J.) (citation omitted).

Most fatal to the intent element of Thames' IIED claim is Plaintiffs' assertion that her termination "[w]as part of a scheme to fabricate a pretext for terminating Gaona's employment." (Docket Entry 1-1, at 7.)  Plaintiffs have consistently characterized Thames' termination as a mere means by which Defendants could accomplish their ultimate end—firing Gaona.  If their primary goal was to terminate Gaona, Defendants could not have intended Thames' emotional distress for purposes of an IIED claim: "a claim for [IIED] will not lie if emotional distress is not the intended or primary consequence of the defendant's conduct." *GTE Sw.*, 998 S.W.2d at 611; *see also McManaway*, 2015 WL 13679501, at *6 (IIED is not available when emotional distress is "derivative of or incidental to the intended or most likely consequence of the actor's conduct").

Even if all these weaknesses could be overcome, Plaintiffs have presented no evidence whatsoever as to the severity of Thames' emotional distress.  Plaintiffs assert that Thames suffers from anxiety and depression as a result of her termination, and that she can no longer sleep without the assistance of medication.  (Docket Entry 34, at 24.)  However, Plaintiffs have produced no evidence to support these assertions.  Again,  Plaintiffs purported to rely on portions of Thames' deposition but failed to actually attach those portions to their response.  (*See id.*)  As the deposition excerpts are not part of the summary judgment record, they need not be considered.   FED. R. CIV. P. 56(c)(3).  In any event, neither anxiety, depression, nor sleeplessness amount to the sorts of "extraordinarily damaging impact[s]" that are necessary to support an IIED claim.  *See Amin*, 66 F.4th at 574; *Munoz*, 926 F. Supp. at 613; *McCray v. DPC Indus., Inc.*, 875 F. Supp. 384, 392 (E.D.

Tex. 1995) (holding that emotional distress resulting in insomnia "is not severe as a matter of law").

Based on the foregoing, Plaintiffs have failed to raise a genuine dispute as to any of the elements of Thames' IIED claim.  Accordingly, Defendants are entitled to summary judgment on that claim and Thames should be dismissed from this case.

## V.    Conclusion and Recommendation.

For the foregoing reasons, I recommend that Defendants' Motion for Summary Judgment (Docket Entry 25) be **GRANTED IN PART** and **DENIED IN PART**.  Specifically, I recommend that Defendants' motion be **DENIED** as to Gaona's USERRA and TXSERRA claims, and **GRANTED** as to Thames' IIED claim.  Because IIED is Thames' only claim, I recommend that she be dismissed from this case.

## VI.    Notice of Right to Object

The United States District Clerk shall serve a copy of this Report and Recommendation on all parties by either (1) electronic transmittal to all parties represented by attorneys registered as a "filing user" with the Clerk of Court, or (2) by mailing a copy to those not registered by certified mail, return receipt requested.  Written objections to this Report and Recommendation must be filed **within 14 days** after being served with a copy of the same, unless this time period is modified by the District Court.  28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b).

The parties shall file any objections with the Clerk of the Court and serve the objections on all other parties.  An objecting party must specifically identify those findings, conclusions, or recommendations to which objections are being made and the basis for such objections; "objections that are frivolous, conclusory, or general in nature needn't be considered." *Williams v.*

*Lakeview Loan Serv. LLC*, 694 F. Supp. 3d 874, 881 (S.D. Tex. 2023) (citing *Battle v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987)).

A party's failure to file written objections to the proposed findings, conclusions, and recommendations contained in this Report and Recommendation shall bar the party from a *de novo* review by the District Court. *Thomas v. Arn*, 474 U.S. 140, 149–52 (1985); *Acuña v. Brown & Root, Inc.*, 200 F.3d 335, 340 (5th Cir. 2000). Additionally, failure to file timely written objections to the proposed findings, conclusions, and recommendations contained in this Report and Recommendation shall bar the aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to, proposed findings and conclusions accepted by the district court. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996) (en banc).

**SIGNED** on February 13, 2025.

Henry J. Bemporad
United States Magistrate Judge

22